## UNITED STATES v. FALLBROOK PUBLIC UTILITY DIST. et al.

### No. 1247–SD.

United States District Court
S. D. California, S. D.

Feb. 24, 1953.

768

Raymond deS. Shryock, Chula Vista, Cal., Commander, U. S. Navy, Attorney for U. S. Navy Dept. and David W. Agnew, Sp. Asst. to Atty. Gen., Attorney for U. S. Navy Dept., for plaintiff.

Wm. B. Dennis, Fallbrook, Cal., for defendant Santa Margarita Mut. Water Co.

Edmund G. Brown, Atty. Gen. of State of California, by George G. Grover, Deputy Atty. Gen. of State of California, for State of California.

YANKWICH, Chief Judge.

The Court signs and files its Findings of Fact and Judgment in the above-entitled case on the trial on the merits of the case as to Santa Margarita Mutual Water Company, defendant, and the State of California as defendant in intervention.

The objections of the Santa Margarita Mutual Water Company, defendant, and the People of the State of California, defendant in intervention, to the Findings of Fact and the Judgment prepared under the direction of the Court and proposed by the plaintiff, and the proposed amendments to such Findings of Fact and Judgment have been considered by the Court and are overruled and denied. The Court, however, has eliminated the text of the Opinion and Order dated December 9, 1952, D.C., 109 F. Supp. 28, 42, as superfluous and not properly part of the Findings.

The Court is of the view that the Findings and Judgment, in the final form proposed, set forth correctly the facts and legal principles as found by the Court in the Opinion and Order just referred to.

The Order which accompanied the Opinion was intended to set forth succinctly the manner in which the Court's conclusions on some of the principal issues are to be transmuted into Findings. This, in conformity with a practice adopted by this Court in certain types of cases. See United States v. Richfield, 1952, D.C.Cal., 99 F. Supp. 280, 284, 297. Neither the Opinion nor the Order *by its terms* was to take the place of formal Findings. Indeed, the Order stated that

"Judgment and Declaration quieting Title * * * will be entered. Such Judgment and Declaration to contain the following specific Findings."

Fifteen *specific* findings to be included in the formal Findings were then set forth. This clearly contemplated future action. So did also the later action of the Court in granting the defendants time to file objections to the findings to be proposed.

The original Findings were lodged on December 29, 1952. Originally, the Court had informed counsel that instead of the usual five days allowed under Local Rule 7, they would have fifteen days from that date in which to file objections and amendments. That time was extended to nearly six weeks, the defendants being given until February 10, 1953, in which to file objections to the new matters contained in the amended draft.

These actions, memorials of which are on the Minutes of the Court, show clearly that at no time was it the intention of the Court to consider the Opinion and the Order for Findings as anything but an intermediate step. Nevertheless, counsel for the defendants filed on February 7, 1953, a Notice of Appeal from the Order.

I have disregarded the notice as premature. For, as of that day, there is no Order or Judgment from which an appeal will lie. It was not a judgment, nor entered as such. Fed.Rules of Civil Procedure, rules 54(a), 58, and 79(a), 28 U.S.C.A. See, Wright v. Gibson, 1942, 9 Cir., 128 F.2d 865; Uhl v. Dalton, 1945, 9 Cir., 151 F.2d 502; Weldon

v. United States, 9 Cir., 1952, 196 F.2d 874. The Findings and Judgment which I have ordered entered as of this date are the Findings and Judgment of the Court in the case after partial trial. Subject to the exception noted in Paragraph 17 of the Judgment, Rule 54(b), Federal Rules of Civil Procedure, they constitute a final order from which an appeal will lie. 28 U.S.C.A. §§ 1291, 2107.

These statements are made in order that counsel for the two defendants will understand the Court's position, and will not jeopardize their rights of appeal by failing to file a new Notice of Appeal from the Judgment this day entered. Otherwise, they may find themselves appealing from an Order which is not final, and, in my view, a premature appeal cannot be given validity by any stipulation of parties, or by an extension of time to docket the appeal, as counsel for the State suggested when these facts were called to his attention.

As to the objections and the proposed amendments, I desire to state that I have considered them all. Some of them involve a mere change of verbiage which could very well be granted, except that, in the interest of economy of time, such action would not now be advisable. Over two and one-half months have elapsed since the Court's decision was announced. Others challenge the conclusion of the Court as to certain matters such as the prescriptive rights acquired by the plaintiff and its predecessors to water used outside the watershed.

I realize the earnestness of counsel in the case. But the conclusions reached were the result of long consideration. Some of the legal principles ultimately declared were anticipated in the Opinion on Pretrial Questions which, at the request of counsel for these defendants and of the Fallbrook Public Utility District, the Court agreed to consider and determine in advance of trial.

Further argument or discussion will not change the position taken. I am also of the view that some of the suggested negative findings and conclusions have no place in the Findings and are anticipatory of claims that might be asserted in the future.

Hence the Order just made rejecting the amendments and approving and signing the Findings of Fact and Conclusions of Law proposed by the Government and lodged with the Clerk on February 10, 1953, with the elimination of the text of the Opinion and Order dated December 9, 1952.

It is not customary to make any comment in ruling on Findings, although I have done it in at least one other instance. See Brooks Bros. v. Brooks Clothing of California, 1945, D.C.Cal., 5 F.R.D. 14. But the nature of the case, the fact that some of the actions of this Court, even the determination of questions of law in advance of trial *at the request of counsel for the three chief defendants in the case,* have been the subject of misinterpretation, and the Court's desire to avoid any disadvantage accruing to the two defendants from their filing of the premature Notice of Appeal, which they have declined to allow me to strike from the files, although such action was suggested to them by letter written by the Clerk of this Court,—I am making this statement so that the record will show conclusively that no appealable order was entered in this case prior to this date.

## FINDINGS OF FACT
## CONCLUSIONS OF LAW
## and
## JUDGMENT

This court having jurisdiction over the above proceedings and the parties thereto, and the cause having come on to be tried as to the defendant Santa Margarita Mutual Water Company, and the defendant in intervention the State of California, having been argued and submitted, and the Court having filed its opinion and its order, both dated December 9, 1952, now makes the following:

### FINDINGS OF FACT

I.  Title to Lands Involved in Controversy

A.  Title to Parcels

1.  The United States of America, in condemnation proceedings, acquired fee

simple title to a tract of land of 9,147.55 acres in San Diego County, California, by a declaration of taking, and decree entered thereon, filed January 21, 1942, in this Court.[1]

2. This tract of land is that portion of the military reservation sometimes referred to as the "U. S. Naval Ammunition Depot" and "Fallbrook Naval Reservation".[2]

3. The United States of America,. in condemnation proceedings, acquired fee simple title to a tract of land of 122,202.72 acres in San Diego County, California, by a declaration of taking, and decree entered thereon, filed December 31, 1942, in this Court.[3]

4. This tract, which is the main portion of the Camp Pendleton Marine Corps Training Base, includes the site of the U. S. Naval Hospital, Oceanside, California.[4]

5. The United States of America, in condemnation proceedings, acquired fee simple title to a tract of land of 1,676.58 acres in San Diego County, California, by a declaration of taking, and decree entered thereon, filed December 23, 1943.[5]

6. The United States of America, by intragovernmental transfer of land in the public domain, included in the Camp Pendleton military reservation a tract of land of 1,574.61 acres in San Diego County, California, by Public Land Order No. 293 dated August 8, 1945.[6]

7. The United States of America likewise acquired fee simple title to a tract of land of 112.11 acres in Orange County, California, contiguous to the above lands acquired by the United States of America in San Diego County, California, by deed dated February 8, 1949.[7]

B. Rights of Way

8. The tracts of land described in Findings 1 and 3 hereof were acquired subject to easements for railroad rights of way in favor of the Atchison, Topeka and Santa Fe Railroad Company.[8]

C. Location of Camp Pendleton

9. The Santa Margarita river traverses the above property of the United States of America for a distance of some 21 miles from the point at which it enters the easterly boundary of that property to the Pacific Ocean. The five parcels described above are component parts of the single military reservation of the United States of America generally known and referred to as "Camp Joseph H. Pendleton" or "Camp Pendleton", Oceanside, California, which reservation includes those military activities known as the U. S. Naval Ammunition Depot and the U. S. Naval Hospital.[9]

10. Camp Pendleton military reservation comprises some 135,000 acres located principally in San Diego County, California, bordering on the Pacific Ocean for approximately 17 miles between the cities of Oceanside and San Clemente, California, and having an area of approximately 211 square miles. U. S. Highway No. 101 traverses the westerly portion of the reservation in an approximate north-south direction, close to the Pacific Ocean. The entire reservation lies west of U. S. Highway No. 395.[10]

## II. Cession of Exclusive Jurisdiction

11. Letters of acceptance dated January 12 and September 8, 1943, and February 18, 1944, were duly transmitted from the Acting Secretary of the Navy to the Governor of the State of California, which recited and accepted the cession by the State of California to the United States of America of exclusive jurisdiction over the tracts of land acquired by condemna-

1. Exh. 15.
2. Exh. 22 (Fallbrook sheet) and Exh. A.
3. Exh. 16.
4. Exh. 22 (Fallbrook sheet) and Exh. A.
5. Exh. 17.

6. Exh. 17.
7. Exh. 17.
8. Exhs. 15 and 16.
9. Exhs. 22 and A.
10. Exhs. 22 and A.

tion proceedings as described in Findings 1, 3 and 5 hereof.[11]

### III. Present Military Use of Lands
#### A. Primary Military Use

12. It is the function of Camp Joseph H. Pendleton to provide housing and training facilities for units of the Armed Forces, to conduct training of units of the Armed Forces in amphibious warfare and experimental work with landing craft, landing vehicles, tracked and affiliated equipment and the development thereof; to conduct combat training of the various units of the United States Marine Corps, including air-ground support coordination, and use of artillery, tanks and other equipment used in the conduct of modern amphibious and land warfare. In addition to the aforementioned activities, it is the function of Camp Pendleton to provide logistic support for units of the United States Marine Corps together with material maintenance and storage facilities, for supplies and equipment and to house and train replacements for subsequent assignment to various operating units of the United States Marine Corps.[12]

13. Camp Pendleton, both at present and prospectively, is the largest and most complete military base in the world for training in amphibious warfare.[13]

14. The United States Naval Hospital, with a capacity of approximately 1,550 beds, established at Camp Joseph H. Pendleton, provides medical and hospital services to personnel of the Armed Forces, their dependents and other authorized personnel at 83 Naval shore activities located in the Southern California area and provides medical and hospital care to personnel of units of the United States Fleet.[14]

15. The United States Naval Ammunition Depot, Fallbrook, California, provides facilities for the storage, segregation, reconditioning and issuing of ammunition for operating units of the United States Fleet and the United States Marine Corps and maintains ammunition stocks for shore establishments of the United States Navy located in the Southern California area. In addition, this Naval Ammunition Depot stores and ships ammunition for use by combat elements of the United States Navy and the United States Marine Corps.[15]

#### B. Agricultural Use

16. The United States of America uses such parts of these lands, as are not immediately required for military activities, for agricultural purposes.[16]

17. The United States of America now leases or has issued permits for use of approximately 5,500 acres of Camp Pendleton, and has leased as much as 6,000 acres. In addition, some 15,000 to 20,000 sheep and 1,000 head of cattle are grazed on the military reservation, and are largely dependent on the Santa Margarita River for their watering needs.[17]

18. A considerable acreage of Camp Pendleton, adaptable to cultivation or irrigation, and not immediately required for military use, is not leased or put to agricultural use due to insufficiency of water.[18]

### IV. Description of Santa Margarita River System

#### A. General Location and Features

19. The Santa Margarita River is a non-navigable intermittent stream having a drainage area of 740 square miles, 192 square miles of which are situated in San Diego County, California, and 548 square miles in Riverside County, California. The

---

11. Exhs. 18, 19 and 20.

12. PTO p. 12 (Note: "PTO" as used in these footnotes means the Pre-Trial Order dated August 25, 1952, which provided (p. 2) that "Upon trial of this cause no proof shall be required as to matters of fact specifically agreed upon in the Pre-Trial Order".)

13. E. B. Robertson, Vol. 6, p. 653, line 15.

14. PTO pp. 12–13.

15. PTO p. 13.

16. W. D. Taylor, Vol. 5, p. 590, line 4.

17. W. D. Taylor, Vol. 5, p. 590, line 15 ff.

18. W. D. Taylor, Vol. 5, p. 595, line 1.

Santa Margarita watershed is semi-arid.[19]

20. Temecula Creek and Murrieta Creek have their junction at the head of Temecula Gorge and there form the Santa Margarita River.[20]

21. Rising on the eastern slope of the Coastal Range in San Diego County, near the present site of the Palomar Observatory, Temecula Creek proceeds in a northerly and westerly direction a distance of approximately fourteen miles where it enters the Pauba Grant of the Vail Estate. After entering the Pauba Grant, it flows northwesterly through a portion of the grant known as Nigger Valley, for a distance of a little more than three miles. It then enters a narrow canyon on the Pauba Grant known as Nigger Canyon for a distance of approximately two miles. Situated across the channel of Temecula Creek at the upper end of Nigger Canyon on the Pauba Grant, in the Northwest Quarter, Section 10, Township 8 South, Range 1 West, is the Vail Dam, creating a reservoir with a capacity of approximately 50,000 acre-feet.[21]

22. Below the Vail Dam, the Temecula Creek traverses Pauba Grant for a distance of approximately eleven miles.[22]

23. Leaving the Pauba Grant of the Vail Estate, Temecula Creek continues its westerly course across the Little Temecula Grant of the Vail Estate for a distance of approximately one and a half miles. That stream then enters the Temecula Grant of the Vail Estate, flowing a distance of approximately two miles.[23]

24. Immediately before leaving the Temecula Grant of the Vail Estate, Temecula Creek has it confluence with Murrieta Creek and below that point is known as the Santa Margarita River.[24]

25. The Santa Margarita River then enters Temecula Gorge, a narrow canyon through which it flows southerly and westerly for a distance of approximately nine miles. Though Temecula Creek prior to its junction with Murrieta Creek, flows alternately as a surface and subsurface stream, the Santa Margarita River throughout Temecula Gorge in the state of nature is a surface stream.[25]

26. Shortly after leaving Temecula Gorge, the Santa Margarita River enters Camp Joseph H. Pendleton, the Marine Corps Training Base. It then flows in a generally southwesterly direction through Camp Pendleton—Naval Ammunition Depot—United States Naval Hospital lands for a distance of about twenty-one miles to the Pacific Ocean. For the full twenty-one miles the course of the river lies entirely within the property of the United States of America.[26]

27. The Santa Margarita River within the boundaries of the above-mentioned military establishments is an intermittent stream.[27]

B. Principal Tributaries

28. There are several tributaries of the Santa Margarita River from tidewater to its head waters.[28]

29. DeLuz Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a westerly and southerly direction to its confluence with the Santa Margarita River several miles within the boundary lines of Camp Pendleton.[29]

30. Fallbrook Creek, an intermittent stream, rises east and south of the Santa Margarita River. Most of its length is within the boundaries of Camp Pendleton and the United States Naval Ammunition Depot and it has its present terminus in Lake O'Neill, an artificial reservoir which lies within the Camp Pendleton area. In

19. PTO p. 5.
20. PTO p. 6.
21. PTO p. 6.
22. PTO p. 6.
23. PTO p. 7.
24. PTO p. 7.

25. PTO p. 7.
26. PTO p. 7.
27. PTO p. 7.
28. PTO p. 7.
29. PTO p. 7.

the state of nature, Fallbrook Creek flowed into the Santa Margarita River.[30]

31. Sandia Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate, proceeds in a southerly direction to its confluence with the Santa Margarita River at a point a short distance above the easterly boundary of Camp Pendleton.[31]

32. Rainbow Creek is an intermittent stream which rises east and south of the main channel of the Santa Margarita River and proceeds in a northerly and westerly direction to its confluence with that river a short distance above Sandia Creek.[32]

33. Murrieta Creek, an intermittent stream, has its source north of the Temecula Grant of the Vail Estate and traverses the lands of the grant before it joins Temecula Creek to form the Santa Margarita River. Junction of the streams takes place at a point about a half mile east of the westerly boundary of Temecula Grant of the Vail Estate and a short distance east of Temecula Gorge. It has several tributaries, most important of which is Cottonwood Creek, an intermittent stream which rises on the Santa Rosa Grant of the Vail Estate. Santa Gertrudis Creek, a tributary of Murrieta Creek, is an intermittent stream rising on the Pauba Grant of the Vail Estate, traversing lands in other ownership before crossing a portion of the Temecula Grant prior to its confluence with Murrieta Creek. Warm Springs Creek, an intermittent stream, rises east of Murrieta Creek and flows into that stream just below the town of Murrieta.[33]

34. Penjango Creek, an intermittent stream, is tributary to Temecula Creek, rising south of that stream and joining it a short distance upstream from the junction of the stream last mentioned with Murrieta Creek. From its source to confluence Penjango Creek traverses a portion of the Little Temecula Grant, and then flows across the Temecula Grant of the Vail Estate, the property upon which its junction with the Temecula Creek takes place.[34]

35. Other affluents of Temecula Creek are Lancaster Creek and Arroyo Seco, both of which are intermittent in character, flowing only during periods of high precipitation and entering Temecula Creek above Nigger Canyon.[35]

C. Underground Basins

36. From its head waters to the Pacific Ocean, the watershed of the Santa Margarita River System is underlaid with numerous subterranean basins. They differ greatly in size and capacity.[36]

37. Underlying the military establishments in question within the Santa Margarita River watershed is an underground basin, with segments of the basin commonly known as:

1. Upper or O'Neill Basin or Segment;

2. Chappo or Home Ranch Basin or Segment;

3. Ysidora or Lower Basin or Segment.

Those segments comprising a single basin are geologically and hydrologically interconnected.[37]

38. Throughout the ground-water basin within the watershed of the Santa Margarita River underlying Camp Pendleton are numerous wells of varying depths in the alluvium. The surface and sub-surface area and the character and type of the deposits penetrated by the wells have been analyzed.[38]

39. Below the Vail Dam, Temecula Creek traverses a highly porous area where that stream, except during periods of high run-off, disappears into the Temecula Basin. In a state of nature, Temecula Creek customarily again becomes a surface

---

30. PTO p. 7.
31. PTO p. 8.
32. PTO p. 8.
33. PTO p. 8.
34. PTO p. 8.
35. PTO pp. 8–9.
36. PTO p. 9.
37. PTO p. 9; G. F. Worts, Jr., Vol. 3, pp. 240–247.
38. PTO p. 9.

stream at a distance of about three miles from the present site of the Vail Dam. The Temecula River (Creek) is now, as a result of the construction of the Vail Dam, a stream completely controlled by that structure, and any water from that source entering the Temecula Basin or Temecula Canyon is derived from the waters impounded by that structure.[39]

40. Within Camp Pendleton the Santa Margarita River does not flow as a continuous surface stream, but, during the dry season of the year, the stream customarily and ordinarily sinks into the highly porous ground water basin underlying Camp Pendleton. When that basin has been filled, the Santa Margarita River ordinarily comes to the surface some two or three miles from tidewater. In a state of nature it continues then to the Pacific Ocean as a stream of diminishing volume.[40]

41. The water in the underground basins is contained by bedrock or other impervious material. The basins are filled with alluvial· deposits of varying degrees of porosity. The waters of the Santa Margarita River, in its course through the valley, penetrate and fill the voids of the porous alluvium. When the water of the stream sinks to bedrock or the other impervious material comprising· the beds of the basins, in which the detrital material lies, it spreads out laterally filling the basins. When completely charged, the waters of the basins support the surface stream and progress slowly downstream through the permeable material.[41]

42. Ground water basins of the character described underlie Temecula Creek in portions of Oak Grove Valley; and Lancaster Creek in Lancaster Valley. Temecula Basin, one of the largest in the entire watershed of the Santa Margarita River, is located on the property of the Vail Estate. This large T-shaped alluvial deposit area has the stem of the

T along the main channel of Temecula Creek for a distance of approximately eight miles, varying in width from two-thirds of a mile to a mile and a half. That area of the Temecula Basin immediately below the present site of Vail Dam is comprised of coarse, highly porous material and is known as the "out wash". Into that "out wash", except in periods of extremely heavy precipitation, Temecula Creek, in a state of nature, sinks. About three miles below the "out wash", the Temecula Basin becomes an artesian area from which Temecula Creek again emerges as a surface stream.[42]

43. The right arm of the T-shaped alluvial basin extends northward underlying Murrieta Creek for a short distance above the stream's confluence with Temecula Creek. The left arm of the T-shaped Temecula alluvial basin extends southward beneath Penjango Creek.[43]

44. Underlying Murrieta Creek and separated from the Temecula Basin is another large alluvial basin known as the Murrieta Basin. That is comprised of valley-fill similar to that found in the other basin. Drafts on this basin and the other underground basins above Temecula Canyon, for agricultural, domestic and other uses, necessitates re-charging of the basins, thus reducing the quantities of water available to downstream users.[44]

45. Due to the existence of granitic rock immediately underlying the stream from approximately the point of confluence of Temecula Creek to the mouth of the Temecula Gorge, the Santa Margarita River in the state of nature is a surface stream. That granitic underlay of the stream continues from the point mentioned across the boundary of Camp Pendleton to a point approximately one and one-half miles below the confluence of DeLuz Creek with the Santa Margarita River. At that point the stream opens out into a rather

39. H. M. Hall, Vol. 1, p. 84, Vol. 2, pp. 115, 126, 127.

40. G. F. Worts, Jr., Vol. 3, pp. 240–247.

41. G. F. Worts, Jr., Vol. 3, pp. 270–271; Exhs. 9–12.

42. H. M. Hall, Vols. 1 and 2, pp. 84 and 152; Exhs. 8, 32 & 36.

43. H. M. Hall, Vols. 1 and 2, pp. 84 and 152; Exhs. 8, 32 & 36.

44. H. M. Hall, Vols. 1 and 2, pp. 84 and 152; Exhs. 8, 32 & 36.

broad alluvial flood plain. That alluvial area extends from the point last mentioned to tidewater, constituting a large ground-water basin. That ground-water basin is comprised of a relatively coarse and loose porous valley-fill at the upstream and comparable to the "out wash" area of the Temecula Basin above described.[45]

46. Approaching the ocean the character of the alluvium becomes increasingly fine and tight.[46]

## D. Elsinore Fault

47. The Elsinore Fault is one of the major geological features of California. That part of it which is of interest in the present case lies across the entire watershed in a general southeasterly to northwesterly direction, shortly west of the communities of Murrieta and Temecula.[47]

48. The Elsinore Fault constitutes an impenetrable barrier between the northeasterly or upper part of the watershed and the southwesterly or lower part, preventing the movement of water from one part to the other except as permitted on the surface at the point where the river enters the upper end of the Temecula Gorge or Canyon, the so-called "lip of the fault". Thus the only source of ground-water passing into the lower valley from the upper valley is that which flows through Temecula Gorge (also known as Temecula Canyon and Railroad Canyon) past the Temecula gauging station of the United States Geological Survey.[48]

## V. United States Geological Survey Records

### A. Location of Gauging Stations

49. The United States Geological Survey has maintained and published records of the following principal gauging stations within the watershed of the Santa Margarita River:

| Stream | Station | Period of record |
|---|---|---|
| Santa Margarita River | Ysidora | From February 19, 1923, to date |
| Santa Margarita River | Fallbrook | " November 25, 1924, to date |
| Temecula Creek | Temecula (Railroad) Canyon | " January 30, 1923, to date |
| Temecula Creek | Nigger Canyon | " January 30, 1923, to date |
| Murrieta Creek | Temecula | " October 1, 1930, to date |

In addition, measurements have been taken for diversions at O'Neill Ditch and at other places on the Santa Margarita River System.[49]

### VI. Geological Aspects of Camp Pendleton Basin

50. The water in the Camp Pendleton underground basin is an integral part of the waters of the Santa Margarita River system in the course of their movement through the watershed to the Pacific Ocean.[50]

51. The basin underlying Camp Pendleton extends from approximately the proposed DeLuz damsite (for location, see Exhibit 10, for example), which is some 11.7 miles from the Pacific Ocean, downstream to a point in the Ysidora Narrows near the ocean. It extends laterally in varying widths of from one-half mile to two miles, and underlies the bed of the Santa Margarita River at all points.[51]

52. The underground basin lies entirely within the watershed.[52]

45. W. R. Muehlberger, Vol. 2, p. 205; Exhs. 9–12.

46. Exhs. 9–12.

47. W. R. Muehlberger, Vol. 2, p. 203, line 23 ff.; Exh. No. 8.

48. W. R. Muehlberger, Vol. 2, p. 204, line 13 ff.; H. M. Hall, Vol. 1, p. 79, lines 4–25.

49. PTO pp. 10–11; G. F. Worts, Vol. 3, p. 250, line 10.

50. G. F. Worts, Jr., Vol. 3, p. 262, line 25 ff.

51. G. F. Worts, Jr., Vol. 3, pp. 241–247.

52. G. F. Worts, Jr., Vol. 3, p. 247, line 4.

53. The underground basin is filled with alluvial material, the significant feature of which is its water-bearing quality.[53]

54. The water-storage unit of the underground basin has a depth of approximately 100 feet. The storage capacity of the basin is 48,000 acre feet, of which some 40,000 acre feet may be considered a potential source of supply. In a state of nature, with all segments of the underground basin filled, the ground water gradient, being in a coastward direction, prevented intrusion of salt water from the ocean into the underground basin. Historically, upstream surface use and pumping from the basin permitted actual salt water intrusion. Constant re-charging of the basin is required to prevent such intrusion.[54]

55. The surface area of the land overlying the Camp Pendleton basin in the alluvial plain is 4,535.3 acres. The natural forage in this area is dependent upon the supply of water in the underground basin. Appreciable lowering of the water table in that basin results in destruction of that forage.[55]

56. The flow of the waters of the Santa Margarita River system constitutes the only source of supply of the water in the underground basin, and the surface flow and the waters of the underground basin constitute a single source of supply.[56]

57. The lower end of the underground basin terminates at an alluvial tongue lying between the basin and the Pacific Ocean. The tongue of alluvium is approximately 800 feet wide, encased in a geological formation known as the San Onofre Breccia which is relatively impervious. Either sea water or fresh water moves through the alluvial tongue, depending on the relationship of the head of the fresh water to the head of the sea water in the alluvial tongue. Sea water has moved through the alluvial tongue to intrude into the fresh water basin.[57]

## VII. Historical Use of Water by Rancho Santa Margarita and Camp Pendleton—Vail Estate

### A. General Statement as to Rancho Santa Margarita

58. The Camp Pendleton military reservation of some 135,000 acres is the property which was formerly known as Rancho Santa Margarita y Las Flores, or Rancho Santa Margarita. It was devoted to the growth and production of horticultural and agricultural crops, and the raising and grazing of thousands of head of cattle.[58]

### B. Lake O'Neill

59. Lake O'Neill is an off-channel, earth fill reservoir, located at the O'Neill or upper segment of the underground basin, having a capacity of some 1260 acre-feet. Since at least 1920, the United States and its predecessors in interest used Lake O'Neill for agricultural and domestic purposes, during the irrigation season, by filling and refilling the reservoir, such beneficial use having been actual, open, notorious, hostile and adverse to all other claimants on the river, and having been continuous and uninterrupted for the statutory period, and under a claim of right.[59]

60. During a five-year period since 1920, 21,502 acre-feet of water have been diverted at the O'Neill Ditch, giving an average of 4,300 acre-feet per year during this five-year period.[60]

53. G. F. Worts, Jr., Vol. 3, pp. 247–298 passim; Detailed description of the alluvial fill, as well as the geological structure which embraces or forms the basin, is contained in the geological exhibits introduced by the United States of America; Exhs. Nos. 9, 10, 11, 12 and 13.

54. G. F. Worts, Jr., Vol. 3, p. 253, line 9 ff.; pp. 257–258, Exhs. Nos. 11 and 12.

55. A. C. Bowen, Vol. 7, p. 828, line 4; W. R. Taylor, Vol. 5, p. 599, line 19.

56. G. F. Worts, Jr., Vol. 3, p. 266, line 19 ff.

57. G. F. Worts, Jr., Vol. 3, p. 261, line 8 to p. 263, line 2.

58. H. W. Witman, Vol. 5, pp. 575 ff.; Rancho Santa Margarita v. Vail, 1938, 11 Cal.2d 501, 81 P.2d 533, 542.

59. H. W. Witman, Vol. 5, p. 576; Exhs. 14 and 44; A. C. Bowen, Vol. 3, p. 399 ff.

60. Exh. 14.

## C. Agricultural Use Outside of the Watershed

61. Stuart Mesa, a part of the property of the United States, borders the Pacific Ocean and lies immediately north of the Santa Margarita River, partly within and partly without the watershed of that river. South Coast Mesa, also a part of the property of the United States, borders the Pacific Ocean and lies immediately south of the Santa Margarita River, partly within and partly without the watershed of that river.[61]

62. Stuart Mesa comprises some 1200 acres of which 964 acres lie outside of the watershed; South Coast Mesa comprises some 600 acres, of which some 269 acres lie outside of the watershed.[62]

63. All of Stuart Mesa outside of the watershed was placed under irrigation by a pipeline system in 1938, and all of South Coast Mesa outside of the watershed was placed under irrigation by a pipeline system in 1939. The irrigation of both areas has been open, adverse, continuous, and hostile, made under a claim of right, and instituted after the Supreme Court of California had declared that there was insufficient water in the Santa Margarita River for either of the major riparian owners.[63]

64. All of the water used in the irrigation systems supplying the two Mesa areas is and has been pumped from the underground basin underlying Camp Pendleton. The duty of water for the 1223 acres so irrigated is 4806 acre-feet per year. Cropping on the Mesas is carried on throughout the year.[64]

## D. Military Use

65. Water has been delivered through the water distribution system of Camp Pendleton since the property acquired by the United States was put in operation as a military installation in 1942. The distribution system at the present time is substantially the same as that put into use in 1942. All of the water distributed by the system is pumped from the underground basin underlying Camp Pendleton.[65]

66. In addition to the water distributed for agricultural (irrigation) purposes on Stuart Mesa and South Coast Mesa outside of the watershed, practically all of the water delivered for military use by the distribution system is delivered outside of the watershed, including Areas 11, 12, 13, 14, 15, 16 and 17, as well as Camp Del Mar.[66]

67. The actual use of water by Camp Pendleton from the year 1943 to date is shown in the following table:

Quantities of Water From
The Santa Margarita River Historically
Utilized Both Within And Without
The Watershed By The United
States of America

| Year | Within – Ac. Ft. | Without – Ac. Ft. | Total – Ac. Ft. |
|---|---|---|---|
| 1943 | 5389 | 1591 | 6,980 |
| 1944 | 5298 | 1785 | 7,083 |
| 1945 | 6396 | 4332 | 10,728 |
| 1946 | 6160 | 3729 | 9,889 |
| 1947 | 6374 | 4350 | 10,724 |
| 1948 | 6894 | 4417 | 11,311 |
| 1949 | 6637 | 5008 | 11,645 |
| 1950 | 6407 | 4402 | 10,809 |
| 1951 | 6275 | 3983 | 10,258 |

61. Exh. 22.
62. Exh. 41.
63. H. W. Witman, Vol. 5, pp. 579 ff.; Rancho Santa Margarita v. Vail, supra.
64. H. W. Witman, Vol. 5, pp. 581, 583; Exh. 41.
65. J. R. McNearny, Vol. 5, pp. 615–616.
66. J. R. McNearny, Vol. 5, p. 616.

This gives an average per year of 9,934 acre-feet. The needed average, on a present-day basis, is 11,000 acre-feet per year.[67]

68. The washing of military vehicles and equipment following immersion in sea water is a major item of water use in the United States Marine Corps.[68]

69. The water requirements of the personnel attached to Camp Pendleton are 200 gallons per person per day.[69]

70. The population of Camp Pendleton on October 30, 1952, was 49,123, and this population is constantly increasing.[70]

71. The planned peace time population of Camp Pendleton, based on planning for the fiscal year 1954, is 105,000 persons.[71] The average annual demand for water from the Santa Margarita River for military purposes premised upon that population figure is approximately 23,500 acre-feet.

E. Natural Surface Irrigation Above Underground Basin

72. Though the Santa Margarita River is an intermittent stream, it has historically for brief periods raised to higher levels within the natural high-water channel of the stream, overflowing lands in Camp Pendleton which during the long dry periods receive only sub-irrigation from the underground basin. That overflow watered, enriched and fertilized the lands, resulting in increased productivity of the land and enhancement of its value.[72]

F. Historical Use of Water by Vail Estate

73. The Vail Estate is the only major owner of riparian lands on the Santa Margarita River other than the United States. It holds fee simple title to 40,575 acres of riparian lands of which 29,410 acres can be practicably and profitably irrigated. If available, 79,510 acre-feet of water from the Santa Margarita River could be applied profitably to those lands.

At the present time, due to the shortage of water, only 4,500 acres of lands of the Vail Estate are being irrigated. The Vail Estate is now building an extension of its irrigation system for the purpose of increasing substantially the number of acres it will irrigate.[73]

74. Pursuant to Permit No. 7032 issued by the Department of Public Works of the State of California, dated February 18, 1948, the Vail Estate completed the construction of the Vail Dam at the head of Nigger Canyon, on the Temecula River, and closed the gates in November, 1948. The storage capacity of this dam is some 50,000 acre-feet. Further development of Vail lands is actively under way.[74]

75. The Vail method of operation is control of the stream by means of the dam, and storage of water in the Temecula basin, from which the pumps on the Vail lands riparian to the Santa Margarita-Temecula River extract water for domestic and farm use.[75]

G. Litigation between Rancho Santa Margarita and Vail Estate

76. On August 22, 1924, the Rancho Santa Margarita, a corporation (in effect the predecessor in interest of the United States of America) instituted action to determine its rights to the waters of the Santa Margarita as against the Vail interest. A legal determination of those rights was expounded by the Supreme Court of California in the case of Rancho Santa Margarita v. Vail, 11 Cal.2d 501, 81 P.2d 533, dated August 11, 1938. Pursuant to that decision the parties, rather than resort to a new trial as was ordered (since the original trial had been conducted over a period of three years consuming 444 actual court days), entered into a stipulated judgment which is an exhibit admitted in this proceeding. In that stipulated judgment, which has been adopted by the United States in a stipulation filed in this

67. Exh. 40.
68. E. B. Robertson, Vol. 6, p. 692.
69. E. B. Robertson, Vol. 5, p. 663.
70. E. B. Robertson, Vol. 5, pp. 677, 678.
71. E. B. Robertson, Vol. 5, pp. 662, 668.

72. W. D. Taylor, Vol. 5, p. 599.
73. Exh. 33; H. M. Hall, Vol. 2, p. 114.
74. Exh. 4; H. M. Hall, Vol. 2, p. 116.
75. H. M. Hall, Vol. 2, p. 151.

Court on July 8, 1952, the respective rights of the Rancho Santa Margarita and the Vail Estate were specified.[76]

### VIII. Soil Classification of Camp Pendleton Property

#### A. Riparian Land Susceptible of Practicable and Profitable Irrigation

77. The Camp Pendleton property of the United States includes 18,648.3 acres of land riparian to and lying within the watershed of the Santa Margarita River, susceptible of practicable and profitable irrigation, having a duty of water of 69,237 acre-feet per year.[77]

#### B. Non-Riparian Lands Susceptible of Practicable and Profitable Irrigation

78. The Camp Pendleton property of the United States includes 1,223 acres lying outside the watershed but irrigated practicably and profitably by water derived from the watershed.[78]

#### C. Total Acreage Susceptible of Practicable and Profitable Irrigation

79. The total acreage susceptible of practicable and profitable irrigation, within the watershed of the Santa Margarita River, and without the watershed but irrigated by waters derived therefrom, is 19,861.3.[79]

#### D. Duty of Water

80. The total duty of water for this acreage is 74,042.5 acre-feet per year.[80]

#### E. Classification of Lands

81. A detailed study of the Camp Pendleton lands within the watershed has been compiled according to standards prescribed by the United States Soil Conservation Service.[81]

1. Class I Lands
   a. Characteristics

82. Class I lands are: very good land with little or no limitation on use. It is nearly level, deep and commonly without erosion.[82]

   b. Acreage

83. There are 3172.7 acres of Class I lands in the 18,648.3 acres described above.[83]

2. Class II Lands
   a. Characteristics

84. Class II lands are: good land with minor physical limitations, as gentle slopes, less deep soils or slight erosion. Choice in crops is reduced or special practices as water management, contour operations, cover cropping or longer rotations are needed.[84]

   b. Acreage

85. There are 1380.7 acres of Class II land in the 18,648.3 acres described above.[85]

3. Class III Lands
   a. Characteristics

86. Class III lands are: moderately good land with major physical limitations, as relatively steep slopes, shallow soils or severe erosion. Choice in crops is further reduced and more protective measures are required as terracing, strip cropping and careful water management.[86]

   b. Acreage

87. There are 3147.8 acres of Class III land in the 18,648.3 acres described above.[87]

4. Class IV Lands
   a. Characteristics

88. Class IV lands are: fairly good land that is best suited to pasture and hay but

---

76. Case cited; Exh. 37.
77. A. C. Bowen, Vol. 3, p. 351, line 11; Exh. 38.
78. Exh. 41.
79. Notes 69 and 70.
80. Exhs. 38 and 41.
81. A. C. Bowen, Vol. 3, p. 357 ff.

82. Exh. 25–B.
83. Exh. 25–B.
84. Exh. 25–B.
85. Exh. 25–B.
86. Exh. 25–B.
87. Exh. 25–B.

can be cultivated occasionally—usually not for more than 1 year in 6. When plowed, careful erosion practices must be used.[88]

b. Acreage

89. There are 4308.2 acres of Class IV land in the 18,648.3 acres described above.[89]

5. Class V Lands

a. Characteristics

90. Class V lands are: land very good for grazing or forestry. It has slight or no physical limitations and needs only good management.[90]

b. Acreage

91. There is no Class V land in the 18,648.3 acres described above.[91]

6. Class VI Lands

a. Characteristics

92. Class VI lands are: land good for grazing or forestry. It has minor physical limitations and needs some protective measures.[92]

b. Acreage

93. There are 6638.9 acres of Class VI lands in the 18,648.3 acres described above.[93]

7. Class VII Lands

a. Characteristics

94. Class VII lands are: land moderately good for grazing or forestry. It has major physical limitations and needs extreme care to prevent erosion or destructive burning, or to overcome other hazards.[94]

b. Acreage

95. There are 8449.9 acres of Class VII land in the Santa Margarita River watershed area of Camp Pendleton. Class VII land is not considered irrigable.[95]

8. Class VIII Lands

a. Characteristics

96. Class VIII lands are: suited only for wildlife or recreation. This land is usually steep, rough, stony, sandy, wet or highly erodable.[96]

b. Acreage

97. There are 10,663.7 acres of Class VIII land in the Santa Margarita watershed area of Camp Pendleton. Class VIII land is not considered irrigable.[97]

IX. Vail Lands

A. Title

98. The lands of the Vail Estate lying in the watershed of the Santa Margarita-Temecula River are owned by the Vail Estate in fee simple.[98]

B. Riparian Lands Susceptible of Practicable and Profitable Irrigation

99. There are 29,410 acres of land susceptible of practicable and profitable irrigation owned by the Vail Estate in the watershed of the Santa Margarita-Temecula River and riparian to that stream.[99]

C. Duty of Water

100. The duty of water upon the 29,410 acres above described is 79,514 acre-feet per year.[100]

D. Soil Classification

1. Class A Lands

a. Characteristics

101. Class A lands are: Lands which by reason of soils, air drainage, elevations, topography and assumed temperatures are suitable for such crops as oranges, lemons, any varieties of avocados and cherimoyas, assuming that the average number of hours in any one year of temperatures below 30° F would not be greater than twenty-

88. Exh. 25–B.

89. Exh. 25–B.

90. Exh. 25–B.

91. Exh. 25–B.

92. Exh. 25–B.

93. Exh. 25–B.

94. Exh. 25–B.

95. Exh. 25–B.

96. Exh. 25–B.

97. Exh. 25–B.

98. PTO p. 68.

99. H. M. Hall, Vol. 2, pp. 106, 114.

100. H. M. Hall, Vol. 2, p. 114.

five, and where minimum temperatures of 20° F do not occur with greater frequency than once in 10 years; and where maximum temperature of 110° F before July 15 or 115° F after July 15 with concurrent humidities lower than 20% do not occur oftener than once in five years.[101]

### b. Acreage

102. There are 10,991.7 acres of Class A lands in the 29,410 acres described above.[102]

### c. Duty of Water

103. The duty of water on these Class A lands is 25,830 acre-feet per year.[103]

## 2. Class B Lands

### a. Characteristics

104. Class B lands are: lands which by reason of their soils, air drainage, elevations, topography and exposures and temperatures are on the average suitable for such crops as oranges, hardy avocados, sapotes and guavas, assuming the average number of hours in any one winter of temperatures below 30° F would not be greater than 100 and where minimum temperatures of 20° F do not occur with greater frequency than once in ten years; and where maximum temperatures of 110° F before July 15 and 115° F after July 15, with concurrent humidities lower than 20% do not occur oftener than once in five years.[104]

### b. Acreage

105. There are 7,210.3 acres of Class B lands in the 29,410 acres described above.[105]

### c. Duty of Water

106. The duty of water on these Class B lands is 16,944 acre-feet per year.[106]

## 3. Class C Lands

### a. Characteristics

107. Class C lands are: lands which by reason of their soils, air drainage, eleva-

tions, topography, slopes, exposures and temperatures are suitable for alfalfa, truck crops such as tomatoes, melons and squash; also deciduous fruits, walnuts, almonds, grapes, olives, figs, loquats, and oriental persimmons; assuming serious injury to blossom or young fruit by late frosts occurring after May 1st or to unharvested mature olives by early fall frosts previous to December 1st, are not of greater frequency than once in five years.[107]

### b. Acreage

108. There are 5,393.7 acres of Class C land in the 29,410 acres described above.[108]

### c. Duty to Water

109. The duty of water on these Class C lands is 13,484 acre-feet per year.[109]

## 4. Class D Lands

### a. Characteristics

110. Class D Lands are: lands which by reason of their soils, air drainage, topography, slopes, exposures and temperatures are suitable for the growth of such crops as alfalfa, annual summer crops, such as potatoes, lettuce, onions, melons, Indian corn, sorghums, etc., assuming summer temperatures between May 1st and October 1st, do not fall below 30° F or rise above 110° F oftener than once in five years.[110]

### b. Acreage

111. There are 5,814.2 acres of Class D lands in the 29,410 acres described above.[111]

### c. Duty of Water

112. The duty of water on these Class D lands is 23,256 acre-feet per year.[112]

## X. Water Available to United States of America at Camp Pendleton

113. The quantity of water available to the United States of America at Camp Pendleton from the Santa Margarita Riv-

101. Exh. 33.
102. Exh. 33.
103. H. M. Hall, Vol. 2, p. 114.
104. Exh. 33.
105. Exh. 33.
106. H. M. Hall, Vol. 2, p. 114.
107. Exh. 33.
108. Exh. 33.
109. H. M. Hall, Vol. 2, p. 114.
110. Exh. 33.
111. Exh. 33.
112. H. M. Hall, Vol. 2, p. 114.

er, including rights of all types and characters, is 12,500 acre-feet per year.[113]

114. The United States has husbanded its water well, as evidenced by the practice, in addition to other conservation measures, of returning sewage effluent to the supply of the underground basin.[114]

115. There is no surplus water at the present time available for appropriation from the Santa Margarita River system; there was no surplus so available in the year 1946; there was no surplus so available when Camp Pendleton was placed in operation as a military installation in 1942.[115]

### XI. Irrigable Land in Watershed

116. There are some 127,000 acres of land, including the Vail lands, in the watershed of the Santa Margarita River, above the Camp Pendleton property of the United States, which are susceptible of practicable and profitable irrigation.[116]

### XII. View by Court of Lands in Controversy

117. The Trial Judge has viewed the lands involved in the present controversy.[117]

### XIII. Additional Facts

118. Pursuant to the provisions of the Stipulated Judgment, Exhibit A of the Complaint, the Vail Estate is required to maintain for the designated period a flow of water of three cubic feet per second at the Temecula Canyon Gauging Station on the Santa Margarita River which would not be present except for the provisions of the Stipulated Judgment.[118]

119. The State of California, defendant in intervention, has entered into the following stipulation with the United States of America which has been approved by this Court and filed in this case:

"On the 15th day of August, 1951, the People of the State of California, in accordance with invitation of the United States of America, petitioned this Court to intervene in this litigation. On that date an Order was allowed and entered by this Court granting the Petition.

"For the clarification of the issues in this litigation, and for the benefit of all of the parties to this cause, it is hereby stipulated:

### "I

"That in Paragraphs VIII and IX of plaintiff's Complaint herein, and in Paragraphs 2 and 3 of the Prayer of said Complaint, the word 'paramount' is used in the same sense in which that word is used in the second paragraph, on page 374 of the opinion of the Supreme Court of California in the case of Peabody v. City of Vallejo, 2 Cal.2d 351, fourth paragraph on page 494, 40 P.2d 486.

### "II

"That in this cause, the United States of America claims only such rights to the use of water as it acquired when it purchased the Rancho Santa Margarita, together with any rights to the use of water which it may have gained by prescription or use, or both, since its acquisition of the Rancho Santa Margarita.

### "III

"That the United States of America claims by reason of its sovereign status no right to the use of a greater quantity of water than is stated in Paragraph II, hereof.

### "IV

"That the rights of the United States of America to the use of water herein are to be measured in accordance with the laws of the State of California.

### "V

"That the parties to this Stipulation will request the entry of a Pretrial Order by this Court defining the issues in this cause, in conformity with the statements contained in this Stipulation.

113. P. F. Henderson, Vol. 5, p. 530; Exhs. 14 and 44; H. M. Hall, Vol. 2, pp. 101–111.

114. A. C. Bowen, Vol. 4, pp. 465–468.

115. Exhs. 14, 44, Y; H. M. Hall, Vol. 2,

pp. 101–111; P. F. Henderson, Vol. 5, p. 530.

116. H. M. Hall, Vol. 2, p. 110.

117. Court, Vol. 2, pp. 116–117.

118. H. M. Hall, Vol. 2, p. 184; Exh. 37.

"VI

."That there will be a full, complete and mutual exchange of data and information as to the subject matter of this cause collected by the respective parties to this Stipulation, including data respecting the issuance of any permits or licenses issued by the State of California in connection with the rights to the use of water of the Santa Margarita River. Such exchange of information by the United States, will be subject to clearance by the Commanding Officer, Camp Joseph H. Pendleton, in respect to military security, as determined by said Officer.

"Dated: November 29, 1951." [119]

120. Application No. 11578 to appropriate water from the Santa Margarita River was filed October 4, 1946, by the Santa Margarita Mutual Water Company with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application was for sixty (60) cubic feet of water per second from the Santa Margarita River. In addition to the direct flow right above mentioned, the application in question is for a storage right of 5,000 acre-feet of water from Temecula Creek at the approximate site of the Vail Dam and Reservoir.[120]

121. Application No. 12152 to appropriate water from the Santa Margarita River was filed November 12, 1947, by the Santa Margarita Mutual Water Company with the State of California, Department of Public Works, Division of Water Resources, State Engineer. The application was for 60,000 acre-feet of water from the Santa Margarita River for storage.[121]

122. The Santa Margarita Mutual Water Company has diverted no water and has no facilities with which to divert or utilize water. However, the plans of that Company if carried out would result in the diversion of large quantities of Santa Margarita River water from the watershed of that stream.

## CONCLUSIONS OF LAW

1. Jurisdiction to entertain this action was conferred upon this Court by express congressional enactment. 28 U.S.C.A. § 1345.

2. The United States of America, as any other owner of property, is entitled to have its rights in that property adjudicated by a court of competent jurisdiction. U. S. v. Fallbrook Public Utility District, U.S.D.C.S.D., 1951, 101 F.Supp. 298, 301.

3. There was ceded to the United States of America by the State of California the exclusive jurisdiction of the approximately 135,000 acres of land comprising Camp Pendleton, the United States Naval Hospital and the United States Naval Ammunition Depot.

4. The State of California has properly intervened in this proceeding. It does not, however, seek to have adjudicated here any substantive rights.

5. The Santa Margarita Mutual Water Company is a public corporation in good standing, organized and existing pursuant to the laws of the State of California.

6. Fee simple title to approximately 135,000 acres of land and to all appurtenant rights to the use of water, both riparian and prescriptive, all as set forth in the preceding findings of this Court, resides in the United States of America, subject, however, to the easement for a railroad right of way of the Atchison, Topeka and Santa Fe Railroad. That land constitutes the site of the Marine Corps Training Base known as Camp Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital.

7. The Santa Margarita River is a natural, non-navigable, intermittent, intrastate stream. In its course it traverses virtually the entire length of the military establishment in question. For its last 21 miles before entering the Pacific Ocean, the Santa Margarita River flows upon and across lands owned by the United States. For that distance, those properties of the United States abut upon both banks of the stream. There are no water users or landowners on the Santa Margarita River below the lands of the United States.

119. PTO pp. 19–20.
120. PTO p. 16.
121. PTO p. 17.

8. There are 37,882.2 acres of the 135,-000 acres of land to which the United States holds fee simple title, riparian to the Santa Margarita River. Of that total, there are 18,648.3 acres that are susceptible of practicable and profitable irrigation.

9. The Vail Estate holds fee simple title to approximately 40,575 acres of land riparian to the Santa Margarita River. Of that total riparian acreage, the Vail Estate holds fee simple title to 29,410 acres of land which are susceptible of practicable and profitable irrigation.

10. The Vail Estate has constructed and now maintains a concrete dam across the Santa Margarita River [sometimes referred to in the particular reach of the river here under consideration as Temecula Creek]. Large quantities of water have been impounded behind that concrete structure and those waters have been diverted and applied to a beneficial use. That structure is known as the Vail Dam and Reservoir and has a potential storage capacity of 50,000 acre-feet. To the extent that water has been actually impounded and applied to beneficial use, there resides in the Vail Estate an exercised and completed appropriative right; to the extent of the potential storage capacity of the Vail Reservoir, there is an incipient, inchoate and unexercised right to the use of water in the Santa Margarita River which shall ripen into a vested appropriative right to that extent or to any lesser quantity which is actually impounded, divested and applied to beneficial use.

11. The Vail Estate has proceeded to acquire the exercised and completed appropriative right mentioned in the preceding paragraph in conformity with the laws of the State of California. It similarly holds the incipient and inchoate rights to which reference has been made. It has a priority for those rights of August 16, 1946, subject to all vested prior rights.

12. The riparian rights of the United States of America and the Vail Estate entitle them to a reasonable use of their correlative share of all of the water of the Santa Margarita River, including the surface flows [which embraces the flow which has historically enriched, fertilized and watered the surface area of the alluvial underground basin underlying Camp Pendleton] and the subsurface flow of that stream which sub-irrigates the lands adjacent to the stream. Those riparian rights of the United States of America likewise entitle it to make a reasonable use of the waters of the underground basin situated within the confines of Camp Pendleton, all of which are more particularly described in the preceding findings. Moreover, the subsurface flow and the underground basin comprise a single source of supply to meet the needs of Camp Pendleton, the United States Naval Hospital and the United States Naval Ammunition Depot. It likewise constitutes the source of water supply for the agricultural uses, including the watering of livestock, all as described in the preceding findings.

13. The flow of the Santa Margarita River is not sufficient to supply all of the riparian needs of the riparian lands of the United States of America. Similarly, the flow of the Santa Margarita River is insufficient to supply all of the riparian needs of all of the riparian lands of the Vail Estate. Thus the average annual yield of the Santa Margarita River is insufficient to meet all of the riparian demands of either the United States of America or the Vail Estate. By a stipulated judgment, Exhibit A of the Complaint, the respective rights of the United States of America and the Vail Estate, insofar as this litigation is concerned, have been established.

14. The riparian rights of the United States of America in the Santa Margarita River are held by it correlatively and reciprocally with all other riparian owners on the stream. The riparian rights to the use of water to which the United States holds title, like all other riparian rights, are part and parcel of the land. It acquired those rights from the Rancho Santa Margarita. They are inseparably annexed to the land; they were not acquired by use nor are they lost by disuse.

15. Riparian rights, like other property rights, are protected against encroachment by the Constitution and laws of

the United States of America and the Constitution and laws of the State of California.

16. Riparian rights to the use of water may be exercised for any beneficial purpose. Moreover, the riparian owner is protected in his riparian rights not only for present actual beneficial uses but likewise for all prospective reasonable beneficial uses.

17. Riparian rights for present actual beneficial uses and for future prospective beneficial uses are, under the laws of the State of California, accorded a paramount and preferential status to the right of any subsequent appropriator.

18. A military use is a beneficial use for which riparian rights may be exercised. D.C., 108 F.Supp. 72.

19. The past and present diversion of water by the United States of America from the Santa Margarita River, as disclosed in the preceding findings, has been a reasonable exercise under the laws of the State of California of its riparian rights. There resides in the United States of America, as against the Santa Margarita Mutual Water Company a right to divert annually from the Santa Margarita River for military use, which use, in the light of evidence adduced, would be a reasonable exercise by the United States of America of its riparian rights in the Santa Margarita River, a quantity of water equivalent to the maximum demands set forth in the findings for agricultural purposes. However, as disclosed by the findings, predicated upon the average annual yield of the Santa Margarita River and the known entitlements to water of the other riparians and appropriators with rights prior to the Santa Margarita Mutual Water Company, there is available to the United States of America for use at Camp Pendleton, the United States Naval Ammunition Depot and the United States Naval Hospital a quantity of water not exceeding 12,500 acre-feet a year. Only by the most careful use and re-use of the waters and protection of the underground basin for peak demand during periods of emergency will the United States be in a position to meet the demands of total mobilization.

20. There resides in the United States of America in connection with those riparian lands susceptible of practicable and profitable irrigation described in the preceding findings, as against the Santa Margarita Mutual Water Company, the right to divert for agricultural purposes the number of acre-feet of water annually, as disclosed by those findings. As recognized above, however, the reasonable irrigation demands for the riparian lands susceptible of practicable and profitable irrigation far exceed the annual yield of the Santa Margarita River.

21. Under the laws of the State of California, rights to the use of water being a species of real property, may be acquired by adverse use for the five-year period prescribed by State statute. That principle applies to the surface flow, sub-surface flow and the waters diverted from the underground basin. Since prior to 1920, the United States of America and its predecessor in interest have impounded water in Lake O'Neill described in the preceding findings and have applied that water to beneficial use. That diversion, as revealed by the findings of fact, has been actual, open, notorious, hostile and adverse to all claims of right, continuous and uninterrupted for the statutory period and made under claim of right. There was, by reason of that fact, acquired a prescriptive right in connection with the structure in question to the quantities of water set forth in the findings of fact. Moreover, all of the elements for acquisition of prescriptive rights have been found to exist respecting the use of water from the Santa Margarita River upon those areas known as the South Coast Mesa and the Stuart Mesa. There resides in the United States of America a prescriptive right to the use annually of the quantities of water set forth in the findings of fact in connection with the area referred to in the preceding sentence.

22. There rested with the Santa Margarita Mutual Water Company, which asserts inchoate and unexercised appropriative claims from the Santa Mar-

garita River with priority dates of October 4, 1946, and November 12, 1947, the burden of proving that there exists in the stream in question a surplus of water in excess of reasonable beneficial uses by those who, at the time the Company sought to initiate its appropriative rights, had prior and preferential rights in that stream. The Santa Margarita Mutual Water Company failed to sustain that burden of proof. To the contrary, as revealed by the findings and evidence, the average annual yield of the Santa Margarita River when the Santa Margarita Mutual Water Company sought to initiate its rights was far short of the demands of the vested rights to the use of water of the riparian, appropriative and prescriptive claims to water from the Santa Margarita River.

23. Each and every right to the use of water of the United States of America in the Santa Margarita River, including but not limited to the rights contained in the Stipulated Judgment, Exhibit A of the Complaint, are prior and paramount to the rights claimed in that stream by the Santa Margarita Mutual Water Company.

24. Predicated upon the decision of this Court entered December 9, 1952, United States of America v. Fallbrook Public Utility District, 109 F.Supp. 28, the findings of fact and these conclusions of law, the United States of America is entitled to judgment in this action adjudging and declaring that it is the owner of the rights to the use of water which were the subject matter of this cause and quieting its title against the adverse claims asserted by the defendant Santa Margarita Mutual Water Company.

## JUDGMENT

The above-entitled case, having come on regularly for trial in open court without a jury, the Court having heard the evidence therein, having inspected the properties involved, having heard the arguments of counsel, and all propositions of law having been thoroughly briefed, and having entered an order and opinion dated December 9, 1952, stating that a judgment will be entered quieting the title of the United States of America in and to its rights to the use of water in the Santa Margarita River against the adverse claims of the defendant Santa Margarita Mutual Water Company; findings of fact and conclusions of law having been duly entered in this Court disclosing the salient facts and principles of law determined herein;

It is hereby ordered, adjudged and decreed that:

1. The United States of America is the owner in fee simple of approximately 135,000 acres of land situated in the Counties of San Diego and Riverside, State of California, together with the appurtenant rights to the use of water hereinafter described.

2. Of the acreage of the United States involved in this litigation, 37,882.2 acres lie in the watershed of the Santa Margarita River and are riparian to it.

3. Of that riparian acreage in the watershed, 18,648.3 acres can be practicably and profitably irrigated.

4. The riparian acreage of the Vail Estate is 40,575 acres, of which 29,410 acres can be profitably irrigated. These lands are, within the watershed of the stream and drain into it. They have access to the stream and constitute one continuous piece, no part of which has ever been severed from its riparian rights.

5. The Vail Estate has, at the present time, 4,500 acres under irrigation.

6. On the basis of an irrigable acreage of 29,410 acres, 79,514 acre-feet of water could be applied profitably to the irrigable lands of the Vail Estate.

7. The 18,648.3 acres of irrigable land of the United States in the watershed would call for a duty of water of 69,237 acre-feet of water per year.

8. As to such prospective use, the United States is entitled to a declaration that its right to such water is paramount to those claimed by the Santa Margarita Mutual Water Company under its applications dated October 4, 1946, and November 12, 1947.

9. As between the United States and the Vail Estate, their correlative rights are to be determined according to the stipu-

lated judgment entered in the case entitled Rancho Santa Margarita v. Vail, No. 42850, Superior Court, San Diego County, on December 27, 1940, as agreed to by stipulation entered between the United States and the Vail Estate on July 8, 1952.

10. The military use is a riparian use and the paramount rights of the United States extend to the full measure of the capable riparian agricultural use to which the lands can be put. The United States has put to beneficial use water to the extent of on an average of 9,934 acre-feet per year. The present needed average is 11,000 acre-feet per year. The peace-time needs of present plans of the Marine Corps are 23,500 acre-feet of water annually from the Santa Margarita River. These quantities are all reasonable and beneficial uses. The maximum demand in the event of full mobilization is a quantity which does not exceed the duty of water for the maximum agricultural use to which the United States would be entitled under its riparian rights.

Included in the quantities of water actually used are 4,806 acre-feet used on irrigated lands outside the watershed which the United States has acquired the right to use by prescription, unaffected by any administrative action by the Department of Water Resources of the State of California.

In addition the United States of America has acquired by prescription the right to divert and impound annually in Lake O'Neill 4,300 acre-feet of water.

11. A study of the water supply leads to the conclusion that not more than 12,500 acre-feet annually from the Santa Margarita River, under the most favorable circumstances, are available as a water supply at Camp Pendleton.

12. If the correlative rights of the two chief riparian owners [the United States of America and the Vail Estate] are considered, there was not at the time of the filing of the appropriation notices by the Santa Margarita Mutual Water Company in 1946 and 1947, any surplus water supply to appropriate.

13. There is no surplus water supply at the present time subject to appropriation.

14. Each and every right to the use of water of the United States of America in the Santa Margarita River which has been proved in this case and reflected in the findings of fact and conclusions of law are prior and paramount to every right asserted by the defendant Santa Margarita Mutual Water Company.

15. As the Santa Margarita Mutual Water Company has not made any diversion and no permits for diversion or for construction of a dam have been issued by the State of California, injunction against further prosecution of the applications is not necessary. A declaration of right will suffice. The Court is certain that, in acting on any application, the State authorities will take into consideration the terms of this decision.

16. It is further ordered, adjudged and decreed that the rights, title, and interest of the United States in and to the rights to the use of water hereinabove described are quieted as against the adverse claims of the defendant Santa Margarita Mutual Water Company and the Defendant in Intervention the State of California, and all parties claiming under them; and they and each of them are forever barred from any and all claim of right, title or interest in and to those rights to the use of water.

17. The adjudication here made and the findings of fact and judgment constitute a partial adjudication of the claims here involved pursuant to the Federal Rules of Civil Procedure, Rule 54(b), 28 U.S.C.A. and they are subject to revision and will not become final until the claims of the Santa Margarita Mutual Water Company and the Fallbrook Public Utility District are finally determined.

This Court reserves the right to grant to the United States of America such further and additional relief as may be required to effectuate this judgment.